UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| NELLY BENJUMEA, <br>         Plaintiff, <br> v. <br> GEM NORTH LLC, *et al.*, <br>         Defendants. | Civil Action No.: 16-cv-2124 <br><br> OPINION |

**CECCHI, District Judge.**

In this matter, Plaintiff Nelly Benjumea ("Plaintiff"), alleges state and federal claims related to the termination of her employment by GEM North LLC ("GEM North") and GEM Ambulance LLC ("GEM Ambulance") (collectively, "Defendants"), during her pregnancy in December 2014. Specifically, the Second Amended Complaint (ECF No. 30, "2d Am. Compl."), alleges violations of the Family Medical Leave Act, 29 U.S.C. §§ 2601–2654 ("FMLA"), and New Jersey's Law Against Discrimination, N.J.S.A. § 10:5-1 *et seq.* ("NJLAD"). Plaintiff now moves for summary judgment as to liability on all claims. ECF No. 51. Defendants oppose, and also move for summary judgment. ECF No. 52. Plaintiff opposes Defendants' cross-motion. ECF No. 54. No oral argument was heard. Fed. R. Civ. P. 78. Having considered the parties' submissions, the Court will deny both motions for summary judgment.

**I. BACKGROUND**[1]

 **A. Plaintiff's Employment with Lifestar and then Defendants**

In April 1999, Plaintiff was hired by Lifestar Response of New Jersey, Inc. ("Lifestar"). Pl. SMF ¶ 1. Plaintiff was employed by Lifestar from that time until January 2014. Id. ¶¶ 2–3.

---

[1] Background facts are taken from the parties' statements of material facts, pursuant to Local Civil Rule 56.1. ECF No. 51-2, Plaintiff's Statement of Undisputed Material Facts ("Pl. SMF"); ECF No. 52-2, Defendants' Opposing and Counterstatement of Material Facts ("Def. SMF"). To the

Between May 2010 and January 2014, Plaintiff worked for Lifestar as a Transport Coordinator at Saint Michael's Hospital in Newark, New Jersey ("St. Michael's"). Id. ¶ 2. In January 2014, Defendants acquired several Lifestar assets, including vehicles, related goods, and assignments of contracts with several hospitals, including St. Michael's. Def. SMF ¶ 5. At that time, some of Lifestar's employees were rehired by Defendants, including Plaintiff. Id. ¶¶ 3, 16. Former Lifestar employees hired by Defendants were interviewed and vetted as if they were "coming off the street." Id. ¶ 16. In total, Defendants hired around nineteen percent of Lifestar's employees. Id. Plaintiff's first day of work for Defendants was January 15, 2014. Pl. SMF ¶ 3.

From January 15, 2014, Plaintiff worked for Defendants as a Transport Coordinator from the same location at St. Michael's where she previously worked for Lifestar. Id. ¶¶ 7–8. In addition to retaining the title of Transport Coordinator, she received the same rate of pay, and kept the same office. Id. ¶¶ 9–10. During her employment by both Lifestar and Defendants, Plaintiff's duties included arranging patient transport, obtaining patient fact sheets and signed Medical Necessity forms from clinicians, and calling logistics for transport authorization numbers. Id. ¶ 11. However, while employed by Defendants, Plaintiff was subject to new policies and procedures not used by Lifestar, reported to a new supervisor, and had additional job responsibilities. Def. SMF ¶ 11. In performing her job duties while employed by Defendants, Plaintiff used some of the same equipment, like the printer and telephone, as she used when employed by Lifestar (Pl. SMF ¶ 12), although Defendants "revamped" computer systems and processes (Def. SMF ¶ 12). Plaintiff also worked with several of the same St. Michael's employees when employed by Defendants as she did when employed by Lifestar, including Maria Samagaio (case management social work) and

---

extent that Defendants have admitted certain facts, the Court will cite only to "Pl. SMF." Insofar as Defendants deny portions of particular paragraphs of Plaintiff's statement while admitting other portions, the Court will also cite to "Def. SMF" for the facts admitted by Defendants.

Maria Lopes-Tyburczy (Director of Administration). Pl. SMF ¶ 13; Deposition of Allyson Orlando, ECF No. 51-4 at 117 ("Orlando Dep.") at 21:14–22:10.

The parties agree that during her tenure with Defendants, Plaintiff was supervised at least in part by Michael Telep ("Telep"). Def. SMF ¶ 19. In addition, during her time as Defendants' employee, Plaintiff was in contact with and was often visited by another employee of Defendants, Allyson Orlando ("Orlando"), yet, as detailed below, the exact nature of Orlando's working relationship with Plaintiff is in dispute. Pl. SMF ¶¶ 19–20, 22; Def. SMF ¶¶ 19–20, 22.

### B. Plaintiff's Pregnancy and Requests for FMLA Leave

In or around April 2014, Plaintiff learned she was pregnant. Pl. SMF ¶ 42. Plaintiff states that her due date was January 6, 2015. Id. ¶ 43. Plaintiff discussed her pregnancy and future plans with Orlando, indicating that she would be absent from work either six or eight weeks post-birth depending on the delivery method. Id. ¶¶ 46–48; Def. SMF ¶¶ 46–48.

Plaintiff's doctor, Robert J. Montemurro, M.D., determined that because of Plaintiff's age at the time of her pregnancy (forty years), Plaintiff required leave from work beginning four weeks prior to her due date. Def. SMF ¶ 56. On October 22, 2014, Plaintiff sent a fax to Telep and Genevieve Joseph ("Joseph"), Defendants' head of human resources, informing them that her "last day of work [would] be December 4, and [her] maternity leave [would] begin[] December 7, 2014." Pl. SMF ¶ 57. Attached to the fax was a note from Dr. Montemurro supporting Plaintiff's need to refrain from work after December 4, 2014. Id. ¶ 58.

Later that day, Plaintiff called Joseph to advise her of the fax and request disability paperwork. Id. ¶ 59. During the conversation, Joseph informed Plaintiff that she was ineligible for leave under the FMLA because she had not been employed by Defendants for twelve months. Id. ¶ 61. Also during the conversation, Plaintiff made a statement referring to a timeframe of "four

weeks." *See* ECF No. 51-5 at 67, 24:8–9; Pl. SMF ¶ 82; Def. SMF ¶ 82. As detailed below, the parties dispute the exact meaning of Plaintiff's statement.

Shortly after the end of this conversation, Plaintiff received an email from Joseph. Pl. SMF ¶ 64. In that email, Joseph again stated that Plaintiff was not eligible for FMLA leave and added that Defendants' policies only permitted two weeks of unpaid leave for employees, like Plaintiff, who had been employed for between six and twelve months. Id. The email continued that since Plaintiff's condition would not allow her to return within two weeks, Defendants would consider her to have "voluntarily separated [herself] from [her] position at the company effective December 5th, 2014." Id. Accordingly, Defendants did not designate the period after December 4, 2015, in which Plaintiff did not work, as FMLA leave. Id. ¶¶ 70–71. Following receipt of Joseph's email, Plaintiff reached out to Orlando and Dawn Van Brunt ("Van Brunt"), Orlando's supervisor. Id. ¶ 72. Orlando did not discuss the situation with Plaintiff and referred her instead to Defendants' human resources staff. Id. ¶¶ 74–75. After Van Brunt spoke with Joseph on Plaintiff's behalf, Joseph called Plaintiff to follow up. Id. ¶¶ 78–79.

### C. Subsequent History

Thereafter, Plaintiff retained an attorney to pursue what she viewed as her right to maternity leave. Pl. SMF ¶ 99. On October 29, 2014, Plaintiff's attorney, who no longer represents Plaintiff in this matter, sent Defendants a letter asserting Plaintiff's right to FMLA leave in view of her "long history" with Defendants and Lifestar. Id. ¶ 100. In or around November 2014, Joseph called Plaintiff's attorney about the letter. Id. ¶ 101. During the call, Joseph reiterated Defendants' position that Plaintiff was not eligible for FMLA leave and that she had not sought an accommodation for maternity leave of any definite duration. Def. SMF ¶¶ 103–05.

Pursuant to Dr. Montemurro's orders, Plaintiff's last day of work was December 4, 2014. Pl. SMF ¶ 111. On December 5, 2014, Joseph sent Plaintiff a letter reiterating that Defendants

4

considered her ineligible for FMLA leave, that Defendants offered only two weeks' unpaid leave to FMLA-ineligible employees with between six and twelve months of service time, and that because Plaintiff had departed from her position without a return date, Defendants considered Plaintiff to have voluntarily separated herself from the company. Id. ¶ 112. On December 24, 2014, Plaintiff delivered her baby. Id. ¶ 115. This suit followed.

## II.    LEGAL STANDARD

Summary judgment is appropriate if the "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," Fed. R. Civ. P. 56(c), demonstrate that there is no genuine issue as to any material fact, and, construing all facts and inferences in a light most favorable to the nonmoving party, "the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).

The moving party has the initial burden of proving the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the nonmoving party has the burden of identifying specific facts to show that, to the contrary, a genuine issue of material fact exists for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). To meet its burden, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citation omitted); *see Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) ("To raise a genuine issue of material fact, . . . the opponent [must] exceed[] the 'mere scintilla' threshold."). An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. *Id.* In considering a motion for summary judgment, the court does not make credibility determinations or weigh evidence; instead, the nonmoving party's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255; *see also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004).

## III.   DISCUSSION

### A.   New Jersey Law Against Discrimination

NJLAD "requires equal treatment for members of the statute's protected classes." *Centeno v. Macy's Corp. Servs., Inc.*, No. 07-1199, 2008 WL 2684578, at *4 (D.N.J. June 30, 2008) (quoting *Gerety v. Atl. City Hilton Casino Resort*, 877 A.2d 1233, 1236 (N.J. 2005)). In January 2014, New Jersey enacted the Pregnant Workers Fairness Act, which expanded NJLAD to incorporate pregnancy as a protected characteristic and to require employers to make reasonable accommodations for pregnant workers. *Ologundudu v. Manorcare Health Servs., Inc.*, No. 15-4021, 2017 WL 6450705, at *2 (D.N.J. Dec. 18, 2017).

The Second Amended Complaint alleges two separate counts relating to NJLAD: Count I ("Pregnancy Discrimination") and Count II ("Retaliation"). 2d Am. Compl. ¶¶ 16–31. The Court will consider each count in turn.[2]

---

[2] However, Plaintiff's brief in support of summary judgment makes arguments pertaining to both a failure to accommodate theory (i.e., that Plaintiff could have continued to perform her job with a reasonable accommodation, which Defendants refused to provide) and a disparate treatment theory (i.e., that Defendants treated Plaintiff differently than other employees because of her pregnancy). The New Jersey Supreme Court has made clear that, under NJLAD, these two distinct discrimination claims may not be conflated. For example, in *Viscik v. Fowler Equip. Co.*, the court held that it was reversible error for a trial court to provide jury instructions pertaining to an employer's failure to provide reasonable accommodations for a disabled employee where the plaintiff had not pled a failure to accommodate theory in her complaint as a separate cause of action. 800 A.2d 826, 837 (N.J. 2002). Here, failure to accommodate and disparate treatment are not separate causes of action, and Count II appears to contemplate failure to accommodate rather than disparate treatment. *See* 2d Am. Compl. ¶ 20 ("Defendants terminated Plaintiff's employment

6

1.  **Failure to Accommodate**

Plaintiff alleges that, although she would have been able to perform her job with a reasonable accommodation, Defendants violated NJLAD by refusing to even consider providing such an accommodation. 2d Am. Compl. ¶¶ 17–19. Under NJLAD, when a disabled employee requests a reasonable accommodation, the request triggers a duty for employers to engage in an "interactive process" to determine what accommodation is necessary. *Tynan v. Superior Court*, 798 A.2d 648, 656–57 (N.J. Super. Ct. App. Div. 2002) ("This process must identify the potential reasonable accommodations that could be adopted to overcome the employee's precise limitations resulting from the disability. Once a handicapped employee has requested assistance, it is the employer who must make the reasonable effort to determine the appropriate accommodation."). To show that an employer failed to participate in the interactive process, an employee must prove: "(1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Id.*

Plaintiff argues that she is entitled to summary judgment because there is no dispute that Defendants, while they knew of her pregnancy, failed to engage in any interactive process or consider extending to her any accommodation. ECF No. 51-1 ("Pl.'s Brief") at 31–33. Plaintiff avers that such a blanket refusal to engage in any accommodations process undisputedly shows that Defendants acted in bad faith. Id. at 32. In their cross-motion, Defendants argue that Plaintiff's claims fail as a matter of law as she cannot show that she requested any reasonable accommodation

---

because Plaintiff was pregnant and required a leave of absence as an accommodation."); id. ¶¶ 17–19 (discussing Defendants' alleged failure to provide accommodations). Thus, the Court will treat Plaintiff's discrimination claim under NJLAD as a failure to accommodate claim.

7

for her pregnancy or that the absence of an interactive process was the result of bad faith. ECF No. 52-1 ("Def.'s Brief") at 20–33. Defendants maintain that the failure to reach an accommodation was the fault of Plaintiff, who never indicated to them a need or desire for maternity leave of a finite duration, rather than bad faith. Id. at 29–30. Defendants assert that Plaintiff never expressed to her employers an intention to return to her position after the birth and only sought FMLA leave under the misapprehension that she would be paid for her time off, after which she intended to separate from the company. Id. at 22–25. In support of their interpretation of events, Defendants maintain that none of Plaintiff's recorded phone conversations with Defendants' human resources personnel show any request for pregnancy leave of a definite duration. Id. at 20. Defendants further explain that Plaintiff's attorney never made such a request on her behalf in any recorded conversation, that none of Plaintiff's written communications with Defendants and their human resources staff indicate such a request, that the note from Dr. Montemurro did not specify any date on which Plaintiff would be able to return to work, and that Plaintiff's position on her alleged requests for an accommodation has been inconsistent. Id. at 20–25.[3]

The Court finds that a genuine dispute of material fact exists as to the nature of Plaintiff's communications with her employer. Specifically, the parties contest whether Plaintiff requested a definite period of leave and whether she made clear to her employer that she envisioned returning to the company soon thereafter. The dispute cannot be resolved at this stage as both parties demonstrated an ability to produce colorable evidence on this point. For example, Orlando

---

[3] The record indicates that Plaintiff received letters of recommendation from two St. Michael's employees in September 2014. ECF No. 51-5 at 36–37. Defendants assert that these letters, in addition to other circumstances in Plaintiff's life, demonstrate that Plaintiff was looking for a new job and "was not coming back." Def.'s Brief at 25. Plaintiff on the other hand, contends that she obtained the letters because she believed "Defendants gave her unfair performance warnings" and she was concerned about her job. Pl.'s Reply at 6.

8

testified that Plaintiff told her that she intended to take six or eight weeks off work to have her baby, depending on the delivery method. Orlando Dep. at 35:19–36:7. Based on the fact finder's view of Plaintiff's relationship with Orlando, it may or may not view that conversation as a request for an accommodation (i.e., for maternity leave of a finite duration). Plaintiff contends that Orlando was among her supervisors (ECF No. 54 ("Pl.'s Reply") at 2, 5, 19), which Defendants deny (Def.'s Brief at 30–31).

Based on the record, a fact finder may or may not believe Orlando was among Plaintiff's supervisors. On one hand, the record shows that on at least one occasion Orlando directed Plaintiff in her job performance. ECF No. 51-5 at 21–22 (in September 2014 Orlando directed Plaintiff by email to perform certain job functions). Further, it is undisputed that Orlando was responsible for managing the relationship between Defendants and St. Michael's, where Plaintiff, alone among Defendants' employees, was stationed full-time. Pl. SMF ¶¶ 20–21. Orlando's supervisor, Van Brunt, also has testified that Orlando supervised Plaintiff. Deposition of Dawn Van Brunt, ECF No. 51-5 at 8 ("Van Brunt Dep.") at 21:9–10 ("I supervised Ally [Orlando] who supervised [Plaintiff]."). [4] Conversely, Telep testified that in fact he was Plaintiff's supervisor (Deposition of Michael Telep, ECF No. 52-5 at 26 ("Telep Dep.") at 16:15–16) ("I guess on paper I was [Plaintiff's] supervisor."), which is arguably corroborated by Plaintiff's testimony (Deposition of

---

[4] Defendants argue that this statement is inappropriate for the Court to consider on summary judgment as another statement by Van Brunt from the same deposition, "I guess you could say that hospital representatives, the on-site coordinators [such as Plaintiff] reported to [Orlando]," (Van Brunt Dep. at 20:7–9), shows that Van Brunt lacked personal knowledge of the matter. In support of their position, Defendants filed a declaration from Van Brunt in which she states that she did not know at the time of her deposition if Orlando was Plaintiff's supervisor. ECF No. 52-6 at 35–36. Nevertheless, the Court is not persuaded at this time that Van Brunt lacked personal knowledge of Orlando's status as to Plaintiff at the time of her deposition, and will consider her deposition testimony despite her declaration. In so much as Van Brunt's formulation "I guess" may undercut the probative value of her statement, it is a matter of credibility for consideration by a finder of fact.

Nelly Benjumea, ECF No. 51-4 at 9 ("Pl.'s Dep.") at 120:23) (when asked if Orlando was her supervisor, Plaintiff responded "[m]y supervisor was Michael Telep").[5]

The Court finds that depending on a reasonable fact finder's view of Plaintiff's statements to Defendants' employees about her pregnancy and leave, the fact finder may conclude that either Plaintiff requested a reasonable accommodation for her pregnancy to allow her to continue to perform her job, or that she sought a period of paid leave prior to her ultimate departure from Defendants' employ.[6] Moreover, even if it could be established that Plaintiff's requests triggered a duty for Defendants to engage in an interactive process, the dispute regarding the meaning of Plaintiff's statements is material to whether Defendants' failure to accommodate was in bad faith or was the result of Plaintiff's own failure to engage with the accommodation process by providing

---

[5] In addition to her conversations with Orlando detailed above, Plaintiff refers to other evidence in support of her view that she requested a reasonable accommodation and thus triggered a duty for Defendants to engage in an interactive process under NJLAD. As with Plaintiff's statement to Orlando, the Court finds that such evidence is not sufficiently conclusive to show that a reasonable fact finder could not return a verdict for Defendants. For example, Plaintiff refers to a phone conversation between herself and Joseph in which Plaintiff was told that Defendants would not grant her FMLA leave. Upon being informed that, in Defendants' view, she did not qualify for FMLA leave, Plaintiff stated "Okay, so that means I'm not going to take those four weeks." ECF No. 51-5 at 67, 24:8–9. Upon being asked for clarification, Plaintiff asked "so you're trying to say . . . I'm not going to get paid for my days off for disability?" Id., 24:11–13. Plaintiff argues that this reference to "four weeks" should have served to clarify Plaintiff's desire to seek pregnancy leave of limited duration. Pl.'s Reply at 25. However, viewing Plaintiff's statement in the context of the entire phone conversation, the Court finds Plaintiff's statement to be sufficiently ambiguous that its precise meaning cannot be determined on summary judgment. A reasonable fact finder may agree that Plaintiff's statement was sufficient to alert Defendants to her desire for four weeks of pregnancy leave, or may agree with Defendants' characterization of the statement as a reference to Plaintiff's "erroneous belief that she was entitled to four weeks paid leave." Def.'s Brief at 25.

[6] To the extent Plaintiff requested pregnancy leave under the FMLA, such request does not necessarily constitute a request for an accommodation under NJLAD. *Ross v. Youth Consultation Serv., Inc.*, No. 14-2229, 2016 WL 7476352, at *7 (D.N.J. Dec. 29, 2016) (holding that without evidence that plaintiff requested a reasonable disability accommodation, plaintiff's prior request for FMLA leave did not trigger a duty under NJLAD for employer to engage in an "interactive process"); *see A.D.P. v. ExxonMobil Research & Eng'g Co.*, 54 A.3d 813, 828 (N.J. Super. Ct. App. Div. 2012) ("The reasonable accommodation process begins with a request by the employee for an accommodation that will allow him or her to perform the essential functions of the job.").

a timeline for her return. *See Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 850 (3d Cir. 2016) (finding defendant not liable for failure to accommodate under NJLAD as failure was due to plaintiff's lack of engagement in the interactive process, not to bad faith by defendant). Thus, summary judgment is inappropriate on Plaintiff's discrimination claim.

### 2. Retaliation

Plaintiff also pled a claim for retaliation under NJLAD. 2d Am. Compl. ¶¶ 25–31. In order to prevail on a retaliation claim, plaintiff must show: "(1) she was engaged in a protected activity known to the defendant; (2) she was thereafter subjected to an adverse employment decision by the defendant; and (3) there was a causal link between the two." *Woods-Pirozzi v. Nabisco Foods*, 675 A.2d 684, 695 (N.J. Super. Ct. App. Div. 1996) (citation omitted). As with Plaintiff's discrimination claim, summary judgment is inappropriate as to Plaintiff's retaliation claim because there is a genuine issue of material fact as to whether Plaintiff engaged in a protected activity. Plaintiff avers that she engaged in a protected activity because she requested maternity leave. Pl.'s Brief at 34. Defendants argue that they are entitled to summary judgment because Plaintiff neither requested a definite period of maternity leave nor otherwise engaged in a protected activity. Def.'s Brief at 27. However, as explained above, a fact finder could reasonably conclude that Plaintiff either did or did not request a definite period of disability leave depending upon its understanding of various communications between Plaintiff and Defendants' employees. Even if it were indisputably established that Plaintiff engaged in a protected activity, summary judgment would still be inappropriate. A fact finder might reasonably conclude that Plaintiff was not terminated due to her request for leave, but because her failure to provide a timeline for her return left Defendants to conclude that she did not intend to return at all.

Thus, there exists a genuine dispute of material fact regarding Plaintiff's retaliation claim and neither party has demonstrated their entitlement to judgment as a matter of law. Accordingly, the Court will deny both parties' motions for summary judgment as to such claim.

## B. Family and Medical Leave Act

Under the FMLA, an eligible employee is entitled to up to twelve weeks of unpaid leave during each twelve-month period for certain qualifying medical conditions, including "the birth of a son or daughter of the employee and in order to care for such son or daughter." 29 U.S.C. § 2612(a)(1)(A). Employees who take such leave are entitled to be returned to either their former position or an "equivalent" position. *Id.* § 2614(a)(1). An employer who fails to provide such leave upon request or otherwise interferes with a qualified employee's attempt to avail herself of FMLA protections, violates the FMLA. *Id.* § 2615. To state a claim under the FMLA, a plaintiff must show that: "(1) she is an eligible employee under the FMLA, (2) defendant is an employer subject to the requirements of the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave notice to the defendant of her intention to take FMLA leave, and (5) the defendant denied her the benefits to which she was entitled under the FMLA." *Parker v. Hanhemann Univ. Hosp.*, 234 F. Supp. 2d 478, 483–84 (D.N.J. 2002) (citations omitted). Under the FMLA, an employee is generally eligible for leave if she has been employed "for at least 12 months by the employer with respect to whom leave is requested under [§] 2612" and "for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A). Importantly, the term "employer" includes "any successor in interest of an employer." *Id.* § 2611(4)(A)(ii).

Here, it is undisputed that: Plaintiff was pregnant when she requested leave (Pl. SMF ¶ 51); Plaintiff's doctor ordered her to cease work as of December 7, 2014 (id. ¶ 58); Plaintiff requested a period of leave under the FMLA to give birth (id. ¶¶ 49–51); and Defendants did not provide Plaintiff with leave and terminated her instead (id. ¶ 64). Furthermore, the parties stipulated that

GEM North and GEM Ambulance are both "covered employers" subject to FMLA requirements. ECF No. 51-5 at 6.

However, Plaintiff's status as an eligible employee is in dispute. Defendants maintain that Plaintiff was not an eligible employee because at the time of her requested leave she had worked as Defendants' employee for less than the required twelve months. Def.'s Brief at 14. Plaintiff argues that she was eligible for FMLA leave because of her many years of full-time employment by Lifestar, which she maintains was Defendants' predecessor in interest. Pl.'s Brief at 8–12. Defendants, in turn, dispute that they are Lifestar's successor in interest. Def.'s Brief at 14–20.

"Whether an employer is a successor in interest is a question of law for the Court." *Osei v. Coastal Int'l Sec., Inc.*, 69 F. Supp. 3d 566, 570 (E.D. Va. 2014) (citing *Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d 770, 786–87 (9th Cir. 2010)); *see Vanderhoof v. Life Extension Inst.*, 988 F. Supp. 507, 514 (D.N.J. 1997) (granting summary judgment and finding plaintiff met time of service requirement because her current employer was her former employer's successor in interest under the FMLA). Although the FMLA does not define "successor in interest," Department of Labor regulations identify eight factors to consider when determining an employer's successorship status. 29 C.F.R. § 825.107(a). The factors are: (1) substantial continuity of the same business operations; (2) use of the same plant; (3) continuity of the work force; (4) similarity of jobs and working conditions; (5) similarity of supervisory personnel; (6) similarity in machinery, equipment, and production methods; (7) similarity of products or services; and (8) ability of the predecessor to provide relief. *Id.* While these factors are not exhaustive or binding, courts in the Third Circuit have consistently looked to these factors to shape their analyses. *See, e.g.*, *Podurgiel v. Acme Mkts., Inc.*, No. 16-2262, 2018 WL 2303794, at *8 (D.N.J. May 21, 2018); *Lombardo v. Air Prods. & Chems., Inc.*, No. 05-1120, 2006 WL 1892677, at *4 (E.D. Pa. July 7, 2006); *Miller*

*v. Level 3 Commc'ns, LLC*, No. 03-4451, 2005 WL 1529419, at *7 (D.N.J. June 29, 2005). "A court should examine these factors from the viewpoint of the employee 'at or near the time of the change in employer.'" *Lombardo*, 2006 WL 1892677, at *4 (quoting *Vanderhoof*, 988 F. Supp. at 513). "A determination of whether or not a successor in interest exists is not determined by the application of any single criterion, but rather the entire circumstances are to be viewed in their totality." 29 C.F.R. § 825.107(b). Therefore, the Court will consider the § 825.107 factors as viewed by Plaintiff during her employment transition from Lifestar to Defendants.

### 1. Successor in Interest Analysis

#### i. Substantial Continuity of Business Operations

It is undisputed that Defendants purchased several assets and contractual rights from Lifestar, and actually provided ambulance services at St. Michael's that were previously provided by Lifestar. *See* ECF No. 52-4 at 91–93, ¶¶ 3–4; Pl. SMF ¶ 7. Although the exact timeline of the transition between Lifestar and Defendants with regard to St. Michael's is not clear, Plaintiff was first notified of Lifestar's closure on January 6, 2014 (Pl.'s Dep. at 57:5–13), received her offer letter from Defendants on January 9, 2014 (ECF No. 52-6 at 24), and began her employ with Defendants on January 15, 2014, the same day that the transaction between Lifestar and Defendants was executed (Pl. SMF ¶ 3; ECF No. 52-6 at 2). Thus, the interruption of operations, if any, was not sufficiently extensive to disrupt a finding of substantial continuity. *See Podurgiel*, 2018 WL 2303794, at *8 (finding continuity of business operations despite "a short interruption to change the signage and the interior of the store"). Accordingly, the Court finds that this factor weighs in favor of successor liability. *See Osei*, 69 F. Supp. 3d at 570 (finding successor in interest liability where plaintiff's employer "took over [a] contract" to provide security at site where plaintiff was a security guard).

ii. Use of the Same Plant[7]

It is not disputed that Plaintiff worked at the same client location (St. Michael's) both before and after the transition between Lifestar and Defendants. Pl. SMF ¶ 7. Indeed, after the transition, Plaintiff made use of the same office in the basement of the family clinic at St. Michael's that she used while employed by Lifestar. Id. ¶ 10. Thus, from Plaintiff's perspective, Defendants' operations at St. Michael's made use of the same facilities formerly used by Lifestar. Further, the record indicates that Defendants continued to use a facility located 657 Union Boulevard, Totowa, New Jersey, which was used by Lifestar prior to its transaction with Defendants. Deposition of Jacob Halpern, ECF No. 52-5 at 2 ("Halpern Dep.") at 46:9–19; ECF No. 52-4 at 91, ¶¶ 10–12; ECF No. 52-6 at 21 (indicating that Defendants assumed a lease agreement between Lifestar and 657 Union Partnership, LTD). Accordingly, the Court finds that this factor favors a finding of successor liability.

iii. Continuity of the Work Force

The record indicates that Defendants hired about nineteen percent of Lifestar's employees. ECF No. 52-4 at 92, ¶ 6. More specifically, sale documents list thirty-four former Lifestar employees, including Plaintiff, hired by Defendants. ECF No. 52-6 at 21–22. Such documents further show that Defendants assumed liability for paid time off earned by such workers. Id. Ordinarily, the hiring of a substantial number of the previous employer's former employees favors a finding of successorship. *See Miller*, 2005 WL 1529419, at *2 (finding successor liability under the FMLA where new employer "hired some of [the former employer]'s employees to . . . ensure a smooth transition period"). Here, however, Defendants' hiring of former Lifestar employees

---

[7] Use of the word "plant" originated in the labor-law context in cases involving manufacturing employees. Where, as here, the employee at issue did not work in manufacturing, the proper inquiry is "whether the new employer uses the same facilities." *Sullivan*, 623 F.3d at 784–85.

15

was less straightforward. In particular, the record indicates that Defendants required Lifestar employees to submit applications to be considered for further employment, and that each hired employee was vetted as if they were "coming off the street applying for a job." Deposition of Genevieve Joseph, ECF No. 51-4 at 55 ("Joseph Dep.") at 119:7–9. Under these circumstances, the Court finds this factor to be neutral.

### iv. Similarity of Jobs and Working Conditions

The Court finds that Plaintiff's job and her working conditions during her employment by Defendants were substantially similar to those during her employment by Lifestar. Plaintiff maintained the same job title and had the same rate of pay in both positions. Pl. SMF ¶¶ 8–9. In both positions, Plaintiff's duties included arranging patient transportation, obtaining patient fact sheets, obtaining signed "medical necessity" forms from clinicians, and calling logistics for transport authorization numbers. Id. ¶ 11. Plaintiff also maintained the same liaisons (Maria Samagaio and Maria Lopes-Tyburczy) among the St. Michael's staff both before and after her transition to Defendants' employ. Id. ¶ 13–14; *see also* Orlando Dep. at 21:14–22:10.

Defendants argue that this factor weighs against successorship because Plaintiff was subject to new employment policies and procedures and had additional job responsibilities, "such as obtaining daily census reports to trend the hospital's influx and output." Def.'s Brief at 19. The Court notes, however, that minor changes to employment policies "reflect minor variations in the work place" which are "not enough to prevent the label of successor employer from attaching." *Vanderhoof*, 988 F. Supp. at 513. Moreover, even if Plaintiff, whose job already included obtaining information and paperwork from St. Michael's staff, had to obtain "census reports," this additional responsibility was not akin to the kind of "fundamental change in the nature of the business enterprise" required to thwart a finding of successor liability. *Id.* at 513–14 (citing *Sys.*

16

*Mgmt., Inc. v. NLRB*, 901 F.2d 297, 304 (3d Cir. 1990)). As in *Vanderhoof*, Defendants' argument mistakes the forest for the trees. "Companies universally change such benefits and policies of an acquired business to conform with their own way of doing business. The changes must be substantial [to preclude successor liability]; they were not substantial in this case." *Vanderhoof*, 988 F. Supp. at 514.

### v. Similarity of Supervisory Personnel

Nothing in the record indicates that Defendants hired any employees who had been supervisory personnel under Lifestar. Plaintiff argues that this factor should nonetheless weigh in favor of successor liability because Plaintiff continued to work for the same St. Michael's employees, Maria Samagaio and Maria Lopes-Tyburczy, as an employee of Defendants as she did for Lifestar. Pl.'s Brief at 11. However, no evidence offered by Plaintiff appears to indicate that such people, who were not Defendants' employees, were responsible for supervising Plaintiff. The Court thus finds that this factor weighs against imposing successor liability here.

### vi. Similarity of Machinery, Equipment, and Production Methods

The record indicates that Defendants purchased a significant quantity of ambulances, auto parts, and other supplies and equipment from Lifestar as part of the purchase agreement through which Defendants acquired the St. Michael's contract. ECF No. 52-6 at 2–22 (listing assets acquired by Defendants from Lifestar, including at least twenty-six vehicles, shop equipment, auto parts, and medical supplies). Thus, it appears that much of the equipment used by Defendants' business was similar to or the same as equipment used by Lifestar. In addition, it is undisputed that Plaintiff, as Defendants' employee, used the same printer and telephone as she had previously used as a Lifestar employee, although Defendants may have provided Plaintiff with a new computer. Pl. SMF ¶ 12; Def. SMF ¶ 12. Accordingly, the Court concludes that this factor

supports a finding of successor liability. *See Sullivan*, 623 F.3d at 786 (similarity of equipment factor favored successor liability where employer and putative successor both "used cash registers, hand trucks, and other equipment usually associated with a retail business chain").

### vii. Similarity of Products or Services

It is clear from the record that Defendants took over a contract to provide ambulance transportation service at St. Michael's. ECF No. 52-6 at 21 (indicating that Defendants assumed liability under an "Ambulance and Medical Transportation Service Agreement" between Lifestar and St. Michael's); *see also* Pl.'s Dep. at 58:2–18 (describing the ambulance services provided by Lifestar); ECF No. 51-4 at 88, 43:24–45:11 (describing the ambulance services provided by Defendants). Thus, the Court finds that both Defendants and Lifestar provided similar transportation services to St. Michael's. Therefore, this factor weighs in favor of successor liability.

### viii. Ability of the Predecessor to Provide Relief

This factor is not relevant here because Plaintiff's request for FMLA benefits occurred in October 2015, long after her employ with Defendants began. *See Vanderhoof*, 988 F. Supp. at 514 (the ability of the predecessor to provide relief was irrelevant where a request for FMLA leave occurred after the transition to the new employer). Thus, the Court will not consider this factor.

In summary, Plaintiff was employed by Defendants in substantially the same position that she performed for Lifestar and as part of Defendants' operation which provided substantially the same services that had previously been provided by Lifestar. Plaintiff began working for Defendants following at most a minimal break in the St. Michael's ambulance operation. Having considered the entire set of circumstances in its totality, as required by 29 C.F.R. § 825.107(b),

and with no one factor having received conclusive weight, the Court concludes that Defendants were Lifestar's successor in interest for the purpose of Plaintiff's FMLA interference claim.

It is undisputed that Plaintiff's history of employment with Lifestar began in April 1999, and that she began to work as a Transport Coordinator at St. Michael's in May 2010. Pl. SMF ¶¶ 1–2. Therefore, Plaintiff worked for Defendants' predecessor in interest for considerably longer than twelve months prior to the beginning of her pregnancy leave in December 2014. Thus, Defendants will be unable to avail themselves of any defense premised on the idea that Plaintiff was ineligible for FMLA leave because of her short length of service to Defendants.[8] Accordingly, given the Court's determination as to successor liability, Defendants are not entitled to summary judgment on Plaintiff's FMLA claim.

2. **Summary Judgment is Not Appropriate on Plaintiff's FMLA Claim**

Despite the above finding of successor liability, the Court cannot grant summary judgment to Plaintiff on her FMLA interference claim because a material factual dispute remains as to whether Plaintiff would have been able to perform the essential functions of a Transport Coordinator following the twelve weeks of unpaid leave allowed under the FMLA. "[T]he FMLA does not require an employer to provide a reasonable accommodation to an employee to facilitate [her] return to the same or equivalent position at the conclusion of [her] medical leave." *Hofferica v. St. Mary Med. Ctr.*, 817 F. Supp. 2d 569, 582 (E.D. Pa. 2011) (citing *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 384 (3d Cir. 2002)). Thus, "part of Plaintiff's proof is that Plaintiff was able to perform the essential functions of [her] job at the expiration of [her] leave." *Conti v. CSX Int'l*, No. 02-1658, 2003 WL 1063960, at *2 (E.D. Pa. Mar. 7, 2003) (citing *Rinehimer*, 292 F.3d at

---

[8] The Court notes that Defendants do not appear to dispute that Plaintiff worked a sufficient number of hours to qualify for FMLA benefits. In any case, Plaintiff presumably worked at least 1,250 hours for Lifestar since her initial hiring in 1999.

384). Although Plaintiff maintains that she was medically cleared to return to work six weeks after the birth of her child, and that the total length of her pregnancy leave would therefore have been nine weeks (Pl. SMF ¶¶ 116–117), Defendants appear to dispute such facts. Defendants point out that Plaintiff's post-hoc assessment of how long her medical leave would have been is supported only by her own testimony. Def. SMF ¶ 116. Further, as Defendants note, Plaintiff testified that following her termination by Defendants she did not seek other employment until at least May 2015, in part because she suffered from depression. Pl.'s Dep. at 87:24–89:6. Under these circumstances, the Court finds that a reasonable finder of fact may or may not credit Plaintiff's testimony about when after her pregnancy she became capable of performing the essential job functions of a Transport Coordinator. Thus, there remains a disputed factual question that is material to Plaintiff's FMLA claim, and summary judgment is not appropriate.

Accordingly, the Court concludes that neither Plaintiff nor Defendants have established that they are entitled to judgment as a matter of law. Thus, the Court will deny both parties' motions for summary judgment.

## IV. CONCLUSION

For the foregoing reasons, the Court denies both Plaintiff's motion and Defendants' cross-motion for summary judgment. An appropriate Order accompanies this Opinion.

DATED: April 2, 2020

Claire C. Cecchi, U.S.D.J.